**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

THE COSAC FOUNDATION, INC.,　　　　)
doing business as The Homeless Voice,　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　) Case No:
vs.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
CITY OF JACKSONVILLE,　　　　　　　)
FLORIDA, a Florida municipal corporation,　)
　　　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　　　)
_____

## <u>VERIFIED COMPLAINT</u>

The Plaintiff, The Cosac Foundation, Inc., sues the Defendant, City of Jacksonville, Florida, alleging as follows:

### <span style="font-variant:small-caps">Preliminary Statement</span>

1.　　An Ordinance amending the City of Jacksonville's Traffic Code prohibits solicitation on all City streets and sidewalks.  It also prohibits standing on medians and exchanging items with motorists along certain roadways.  Together, these provisions ban asking for and receiving donations, and distributing literature, in large swaths of the City.

2.　　Although the Ordinance allows people to seek a permit to engage in these activities, the permitting scheme is largely illusory.  Applicants can obtain permits for a maximum of six days per year (two permits per year, each for a 72-hour period)—effectively banning charitable solicitation for 359 days of the year.

In addition, the Ordinance imposes insurmountable hurdles to apply for these limited permits: Applicants must submit a detailed safety plan, indemnify the City, and obtain a million-dollar commercial liability insurance policy. Finally, if an applicant manages to comply with those requirements, the standard for approving permits is vague and provides City officials with nearly unfettered discretion.

3.      Plaintiff, The Cosac Foundation, Inc., is a non-profit corporation that solicits donations in the City of Jacksonville, while distributing *The Homeless Voice*, a newspaper that reports on issues related to homelessness. The Ordinance has effectively banned their activities throughout the City.

4.      The Ordinance is an unconstitutional infringement of the First Amendment, both on its face and as applied to Plaintiff.  As the result of the City's adoption and enforcement of the Ordinance, Plaintiff has been hindered in the exercise of its First Amendment rights, faces a continuing threat of citation and arrest for its solicitation activities, and has suffered damages.  Plaintiff therefore seeks damages and injunctive relief for the past and future violations of its constitutional rights, and the rights of all those who wish to solicit donations in the City.

<u>**JURISDICTION AND VENUE**</u>

5.      Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 for past and ongoing violations of the First Amendment to the U.S. Constitution.

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

7.     Venue lies in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b). The Defendant is located in this District and all of the acts and omissions complained of herein occurred and will continue to occur in the Middle District of Florida.

**PARTIES**

8.     Plaintiff The Cosac Foundation, Inc. (Foundation), is a Florida nonprofit corporation.

(a)     The Foundation is exempt from federal income taxation under Section 501 (c)(3) of the Internal Revenue Code.

(b)     The Foundation is incorporated in the State of Florida, and maintains its principal offices in Broward County, Florida.

(c)     The mission of the Foundation is to assist the poor and homeless people through education, advocacy, and direct service.

(d)     The Foundation receives and uses donations to support its activities, including transitional living facilities for the homeless and working poor, other charitable endeavors, and publication of *The Homeless Voice* newspaper.

(e)     The Foundation operates in Jacksonville, Florida.

9.     Defendant City of Jacksonville (City) is a municipal entity organized under the laws of the State of Florida.  The City enacted the Ordinance though the City Commission.  The Ordinance is the official policy of the City.  The City at all instances relevant to this Complaint acted under the color of law.

10.     The Jacksonville Sheriff's Office (JSO) is authorized by the City to enforce City ordinances.

11.     The City is sued for injunctive and declaratory relief and damages on the basis of acts of officials, officers, agents and employees of the City and JSO, which were taken pursuant to official policy, practice and/or custom.

12.     At all times relevant herein, the officials, officers, agents, and employees of the City and JSO were acting under the color of state law.

## STATEMENT OF FACTS

### A. The Foundation's Activities – Solicitation of Donations and Distribution of *The Homeless Voice*

13.     The Foundation publishes and operates *The Homeless Voice*, a newspaper which reports on, and seeks to raise awareness of, the issue of homelessness in Jacksonville and in other local communities throughout Florida and nationwide.  In furtherance of its mission, Foundation solicitors distribute the newspaper to interested persons, and discuss such issues as homelessness, medical care, transitional living facilities, rehabilitation, veterans services, and religion.  The newspaper is free.

14.     The Foundation solicits donations, and distributes *The Homeless Voice*, primarily through a solicitor program comprised of homeless and formerly homeless individuals ("solicitors"), who, after training on safety issues, go onto the medians of roadways and stand on adjacent sidewalks and shoulders of roadways to request donations and distribute the newspaper.  The program

provides job skills and meaningful work to homeless and formerly homeless people.

15.     Solicitors primarily operate at the intersections of major streets and roadways.  This is where the Foundation can best express its ideas, distribute its newspaper, and collect the most money in donations.   Occupants of motor vehicles are part of the Foundation's intended audience.

16.     Foundation solicitors seek voluntary donations from the public.  The solicitors offer the newspaper to motorists who are stopped at traffic lights.  If the motorist takes the paper, the solicitor asks for a donation.  The donation is optional—solicitors make clear that motorists are free to accept the paper without making a donation.  Many motorists simply give a donation without taking a newspaper.

17.     The Foundation solicitors wear distinctive bright orange and yellow shirts or vests, and they are careful to carry the papers with them so that they are not blown away and litter the road.

18.     Before dispatching solicitors to medians and adjacent sidewalks, the Foundation trains the solicitors on how safely and courteously to distribute its free newspaper and solicit and receive donations.

19.     The solicitors are well behaved, friendly, and respectful of the motorists on the roadway.  They do not obstruct traffic.  They stand on sidewalks, shoulders of roadways, and medians and hold up a copy of the newspaper for display.  If someone requests a paper or offers a donation, they will leave the

median or sidewalk, walk to the car, retrieve the donation and/or distribute the newspaper, and immediately return to the closest sidewalk or median before the light changes.

20.    Solicitors only interact with motorists when the vehicle is stopped for a traffic light.

21.    The donation amounts collected by the solicitors are shared between the Foundation and the solicitors.

22.    The Foundation uses the money to support the Foundation's transitional living facilities for the homeless and working poor.  The Foundation currently owns and operates two facilities just outside Lake City, Florida, in Columbia County.

23.    The distribution of *The Homeless Voice*, and solicitation and receipt of donations, fall within the ambit of the First Amendment. The use of the medians to display and distribute *The Homeless Voice* and solicit and receive donations come within the ambit of the First Amendment.  Each is a First Amendment activity.

24.    In 2017, the Foundation began to solicit and distribute *The Homeless Voice* at numerous intersections in Jacksonville.

25.    Solicitors for the Foundation would solicit and distribute *The Homeless Voice* five days a week for four to six hours a day, during daylight hours only.

26.    The Foundation solicitors developed positive relationships with motorists who frequently stopped at their spots.

**B. Ordinance 2022-574-E**

27.    On February 14, 2023, the City enacted Ordinance No. 2022-574-E (the "Ordinance"), which amended the City's Traffic Code, Chapter 804 of the City of Jacksonville's Municipal Code of Ordinances (Code). A copy of the ordinance is attached as ECF 1-3 (redline version is the only publicly available version).

### 1. The Bans

28.    The Ordinance prohibits "Soliciting in the right-of-way." Code § 804.807(h) (Solicitation Ban). "Soliciting" is not defined in the Ordinance.

29.    The Solicitation Ban applies in the "right-of-way," which broadly consist of all roads, sidewalks, and land devoted or required for transportation. Code § 804.807(g) (defining right-of-way by reference to Code § 804.1701(a), which in turn relies on the definition in the Florida Statute). Thus, the City prohibits soliciting on any road or sidewalk in the City.

30.    The Ordinance prohibits "any person to stop, stand, or otherwise occupy or remain in a median on any designated roadway when that person is not in the process of lawfully crossing the road[.]" Code § 804.1701(b)(1) (Median Ban).

31.    The Ordinance prohibits "any person to engage in any physical interaction between a pedestrian and an occupant of a motor vehicle, including but not limited to the transfer of any product or material, while the motor vehicle is not legally parked and is located on the traveled portion of a designated roadway." Code § 804.1701(b)(2) (Physical-Exchange Ban).

32.    The Median Ban and Physical-Exchange Ban apply in and on a "designated roadway," which consists of highways, as well as collector and arterial roadways (defined as those classified as a collector or higher on the Functional Highway Classification Map, ECF 1-4), and the first 440 feet of local roads that intersect with the foregoing roads. Code § 804.1701(a)(1). The designated roadway includes not only the portions used for vehicular traffic, but also four feet outside the shoulder or curb, which includes the sidewalks in that area. Code § 804.1701(a)(1).

33.    The Ordinance prohibits "us[ing] any public right-of-way for commercial activity." Code § 804.1701(b)(3) (Commercial Activity Ban). "Commercial activity" is undefined, but the Ordinance states that it "includes, but is not limited to, vending or sale of goods, display of goods for sale, storage of goods for sale in connection with commercial activity, or repair or manufacturing of goods." *Id.*

34.    The right-of-way and designated roadways are traditional public forums. The medians separating traffic lanes on a roadway are traditional public forums.

35.    Many roads in downtown Jacksonville are designated roadways, as shown by the map below (portion of ECF 1-4).  Each road in color (not grey), plus 400 feet of the grey roads from their intersection with a road in color, is a designated roadway:



36.    The Ordinance's coverage is extensive, covering roads and intersections with minimal traffic.

37.    For instance, the following locations are on designated roadways, where the Solicitation Ban and Physical-Exchange Ban apply:

(a)    300 block of N. Julia St. because it is a collector.

(b)    000 block of E. 6th Street because it is within 400 feet of N. Main Street, a principal arterial.

     (c)    200 block of E. 10th Street because it is withing 400 feet of N. Liberty St, a collector.

38.    The medians at the following locations are adjacent to a designated roadway, where the Median Ban applies:

     (a)    500 block of N. Market Street because N. Market Street is a collector.

     (b)    1800 block of San Marco Blvd. because it is a collector.

     (c)    900 block of Old Grover Manor, because it is withing 400 feet San Jose Blvd., a collector.

     (d)    1000 block of Arbor Ln intersecting with Laural Lane because it is within 400 feet of Hendricks Avenue, which is a minor arterial.

39.    The Ordinance penalizes soliciting without a permit with a fine, Code § 804.807(h).

40.    The Ordinance penalizes the prohibitions in Code § 804.1701 (including the Median Ban, Physical Exchange Ban, and Commercial Activity Ban) with progressive sanctions from a warning to notice, trespass warning, and jail. Code § 804.1701(d).

41.    A trespass after a warning can be a violation of state law, § 810.08, Fla. Stat., for which a person may be arrested and jailed.

## C. **The Permitting Scheme**

42.    The Ordinance allows persons to engage in the otherwise prohibited activities listed above through a permitting scheme, if such person seeks to engage in "charitable solicitation" and secures a permit.   Code § 804.807(h); § 804.807(a);  § 804.1701(b). The Ordinance does not define "charitable solicitation."

43.    However, the permitting scheme is illusory in practice.

44.    If granted, a permit "shall be valid for a specific time period not to exceed 72 consecutive hours." *Id*. § 804.807(e). Moreover, "[n]o individuals or group shall be granted more than two permits per calendar year." *Id*. § 804.807(f).

45.    Thus, a permit would only allow the Foundation to solicit on six days per year.  The Ordinance therefore amounts to a 359-day ban on solicitation on every road and sidewalk in the City.

46.    To obtain a permit, an applicant must provide (a) its name and address; (b) "a plan for review and comment by the City Traffic Engineer, which plan will maximize the safety of the applicant's representatives, as well as the motoring public, at the locations where the solicitations will take place;" (c) the location and duration of solicitation, not to exceed 72 consecutive hours; and (d) an indemnification in favor of the city "in a form satisfactory to the City attorney."  Code § 804.807(a)(1)-(4).

47.    The City provides no guidance—let alone narrow, objective, or definite standards—regarding what form the City attorney should consider "satisfactory."

48.    The City grants unbridled discretion to the City attorney to decide whether the indemnification is satisfactory and thus what permit applications may be approved.

49.    The City's Public Works Department shall only approve the permit application if the Department determines "that the use will not interfere with the safe and efficient movement of traffic and the use will cause no danger to the public."  Code § 804.807(a)(7).  The City provides no further guidance on how it will reach that determination.

50.    The City does not provide narrow, objective, or definite standards for the Department to determine whether a permitted use will interfere with traffic or place the public at risk.   The City grants unbridled discretion to the Department to approve or deny the application on its whim.

51.    The safety plan submitted by the applicant must contain a "list of safety methods" published by the City's Traffic Engineer.  Code § 804.807(a)(2). An applicant must abide by the terms of the permit and the safety plan.  Code § 804.1701(c)(6).

52.    The safety methods published by the City's Traffic Engineer include "[w]ear[ing] a bright orange or fluorescent green safety vest" and "[p]ost[ing] warning signs in advance of the solicitation area." (The Sign and Vest

Requirements). ECF 1-5. The signs must be at least 2 feet by 2 feet orange warning (diamond) shaped signs, must be posted at least 250 feet in advance of the activity, and must say CHARITY SOLICITATION AHEAD.  For multilane roads with medians, two signs must be posted (one in the median and one on the roadway shoulder).

53.    Additionally, the permit applicant must "provide proof of commercial general liability insurance against claims for bodily injury and property damage occurring on city roadways . . . having limits of not less than $1,000,000 per occurrence[.]" Code § 804.807(a)(7).

54.    An individual "determined to be indigent" is exempt from this insurance requirement.  *Id.*  To establish indigency, an applicant "must provide an application for determination of civil indigent status such application being the same application used by the Clerk of Court." *Id.*

55.    The insurance requirement is needlessly onerous and excessive.

56.    Section 57.082, Fla. Stat., provides for the determination of civil indigent status.  The Florida Supreme Court provides a form for the Duval clerk to                                                                                     use, https://www.flcourts.gov/core/fileparse.php/293/urlt/indigent_application.pdf. The law and form only envision a natural person applying for civil indigent status.  *See* § 57.082(2)(a)(1), Fla. Stat. (applicant is indigent if income is less than 200% of federal poverty guidelines for size of household).  The Foundation

cannot be determined indigent by this application and thus cannot request a waiver of the insurance requirement imposed by the permitting scheme.

### D. **Enforcement of the Ordinance**

57.    The Ordinance became effective on February 14, 2023.  Section 4 of the Ordinance allowed for a grace period for the first thirty days after the effective date, during which JSO conducted a public education campaign and was permitted to only issue warnings to violators.

58.    The JSO has enforced the Ordinance against homeless and poor people who were soliciting for donations along city streets and roadways. Through August of 2023, the JSO has issued three civil citations and has arrested a repeat offender and booked him into the county jail.

59.    After the passage of the Ordinance, Jacksonville Sheriff's deputies first warned and then ordered Foundation solicitors to stop soliciting and warned that if they persisted, they would be cited and ultimately arrested.

60.    On May 27, 2023, at approximately 10:00 am, two JSO deputies pulled up in a squad car at Hodges and Beach Boulevard in Jacksonville and stopped Foundation solicitors Billy Albert and George Rabakozy, who were standing on the median soliciting and distributing the newspaper.

61.    One of the deputies asked whether they had a permit, and Mr. Albert answered they did not.  The deputy told them that what they were doing wasn't safe.  Mr. Albert asked the deputy whether it would be safer if they had a permit.

The deputy didn't reply and asked for their identification and told them that due to the Ordinance, they would not be allowed there again to solicit. He also told them to let their organization know that they and others from the Foundation were not to return to that location to solicit. Not wanting any trouble, Mr. Albert and Mr. Rabakozy complied with the order and left the area.

62. Later that same morning, at the intersection of Monument and Atlantic Boulevard, JSO Deputy Boegert pulled up to Foundation solicitor Fred Wucher and demanded to see a permit. When Mr. Wucher told him he didn't have one, Deputy Boegert ordered Mr. Wucher to leave the area and told him "you can't do this anymore in Jacksonville."

63. On May 30, 2023, at approximately 12:00 pm, at Southside Boulevard and Baymeadows in Jacksonville, JSO Deputy Wittrock stopped Foundation solicitors Barbara Powell and George Rabakozy and ordered them to get off the median. The deputy ran a check on their IDs and told Ms. Powell and Mr. Robakozy that they were both in the system, and that the next time they were caught soliciting, they would be issued a formal citation, and if again after that, they would be taken to jail. The deputy ordered them to leave and not to return there to solicit. The solicitors complied with the order and immediately left.

64. On June 4, 2023, at approximately 1:30 pm, at the intersection of Oldfield Crossing and Old St. Augustine Road, Foundation solicitors Thaddeus Bastian and Bryan Kommes were told to stop soliciting by a JSO deputy. The deputy told them that what they were doing was no longer legal and that if they

were stopped again, the penalty would increase to a citation, and then if again for a third time, they could be taken to jail.   Mr. Bastian and Mr. Kommes complied and immediately left the area.

65.    That same day, Foundation solicitors Fred Wucher, Barbara Powell, George Robakozy, and Greg Hanna were stopped by JSO deputies at other intersections in the city and were told they could no longer solicit in Jacksonville.

### E. Effect of Enforcement of the Ordinance

66.    Because it fears its solicitors will be cited or arrested, the Foundation has not solicited and distributed its paper along streets and roadways in Jacksonville since early June of 2023.

67.    The Foundation wants to solicit and distribute its newspaper in Jacksonville at the intersections of the major streets and roadways because that is where it can best express its message and collect the most money in donations. But it fears its solicitors will be cited or arrested for a violation of the Ordinance.

68.    The Foundation and its solicitors face a credible threat of being cited, charged, arrested, prosecuted, and/or jailed under the Ordinance.

69.    Because the Foundation has been deterred from soliciting and distributing *The Homeless Voice* in Jacksonville, it has not been able to obtain donations that it would otherwise receive and has suffered financial damage.

70.     The City caused these past injuries, which may be redressed by this Court awarding nominal damages for silencing speech and compensatory damages for the Foundation's lost donations and other financial damages.

71.     The Foundation's injuries are fairly traceable to the City's enactment of the Ordinance and its enforcement.

72.     The Foundation intends to immediately resume its solicitor program in Jacksonville if the Ordinance is enjoined.  But for the fear that its solicitors would be arrested or cited, it would operate its solicitor program.

73.     There is a substantial risk that these injuries will continue unless the Ordinance is enjoined.  The City will cause the Foundation's future injuries.

74.     The ongoing threat of citation and arrest has had a chilling effect on the Foundation's exercise of its First Amendment rights in the City of Jacksonville.  Consequently, the Foundation has suffered and continues to suffer damages and harm for the violation of its constitutional rights under the First Amendment.

## CAUSES OF ACTION

### COUNT 1 – FIRST AMENDMENT
### Section 804.807(h) – Solicitation Ban

75.     Plaintiff realleges and incorporates the allegations in all paragraphs preceding the Causes of Action section as if set forth herein.

76.     Requests for donations and distributions of literature are recognized as speech entitled to First Amendment protection.

77.     The City's streets, sidewalks, and medians are traditional public fora.

78.     Section 804.807(h) is a content-based restriction on speech, as it singles out one subject area of speech for different treatment than speech on other subject matters.

79.     Section 804.807(h) is not narrowly tailored to, and is not the least restrictive means of serving, any compelling government interest, and is therefore unconstitutional under the First Amendment.

80.     Should section 804.807(h) be found to be content neutral, it is still subject to intermediate scrutiny.

81.     Section 804.807(h) is not narrowly tailored to serve a significant government interest, and does not leave open ample alternative channels of communication, and is therefore unconstitutional under the First Amendment.

82.     Section 804.807(h) is substantially overbroad when compared to its legitimate sweep.

83.     The City's adoption and ongoing enforcement of Section 804.807(h) have proximately caused the deprivation of Plaintiff's First Amendment rights.

84.     The City's enactment and past and continued enforcement of the ban have proximately caused the deprivation of Plaintiff's rights secured by the First Amendment.

## <u>COUNT 2 – FIRST AMENDMENT</u>
### Section 804.807 – Permitting Scheme

85.   Plaintiff realleges and incorporates the allegations in all paragraphs preceding the Causes of Action section as if set forth herein.

86.   The City's permitting scheme is an unconstitutional prior restraint of First Amendment activities.

87.   Limiting permitted activities to six days per year, and banning them the remaining 359 days, is a severe restriction that is not narrowly tailored to serve a significant governmental interest, and does not leave open ample alternative channels of communication.   It is substantially overbroad when compared to its legitimate sweep.

88.   The application procedures, including the requirements to submit a safety plan, indemnify the City in a form satisfactory to the City attorney, and obtain a million-dollar insurance policy are substantial obstacles to exercising First Amendment rights, and deter the exercise of First Amendment rights.

89.   The City's insurance requirement burdens First Amendment activities because the cost is excessive, not nominal.

90.   The application procedures are not narrowly tailored to serve a significant governmental interest, and do not leave open ample alternative channels of communication.  They are substantially overbroad when compared to their legitimate sweep.

91.   The standard by which City officials determine whether to grant or deny permits for charitable solicitation—"the use will not interfere with the safe and efficient movement of traffic and the use will cause no danger to the public"—

vests unbridled and limitless discretion with the City to deny the permits, in violation of the First Amendment.

92.    In violation of the First Amendment, the Ordinance vests unbridled and limitless discretion in the City Attorney to decide whether the indemnification is satisfactory and thus what permit applications may be approved.

93.    The City's permitting scheme does not advance a significant government interest.

94.    The City enforces the bans unless the person has a permit.

95.    The City's permitting scheme and its past and continued enforcement of the ban without a permit have proximately caused the deprivation of Plaintiff's rights secured by the First Amendment.

## COUNT 3 – FIRST AMENDMENT
### Sections 804.1701(b)(1) –Median Ban

96.    Plaintiff realleges and incorporates the allegations in all paragraphs preceding the Causes of Action section as if set forth herein.

97.    The median is a public forum.

98.    The Median Ban restricts access to this public forum. The ban imposes a disproportionate burden upon those engaged in protected First Amendment activities.

99.    Solicitation of charitable contributions is protected speech under the First Amendment.

100. The Median Ban is not a reasonable time, place, and manner restriction, in that it is not narrowly tailored to serve a significant governmental interest, and it does not leave open ample alternative channels of communication.

101. The City's enactment and its past and continued enforcement of the ban have proximately caused the deprivation of Plaintiff's rights secured by the First Amendment.

## COUNT 4 – FIRST AMENDMENT
### Sections 804.1701(b)(2) –Physical Exchange Ban

102. Plaintiff realleges and incorporates the allegations in all paragraphs preceding the Causes of Action section as if set forth herein.

103. The distribution of *The Homeless Voice* and receipt of donations are protected First Amendment activities.

104. The Physical-Exchange Ban is not narrowly tailored to achieve a significant government interest, and it does not leave open ample alternative channels for these First Amendment activities.

105. The City's enactment and its past and continued enforcement of the ban have proximately caused the deprivation of Plaintiff's rights secured by the First Amendment.

## COUNT 5 – FIRST AMENDMENT
### Sections 804.1701(b)(3) – Commercial Activity Ban

106. Plaintiff realleges and incorporates the allegations in all paragraphs preceding the Causes of Action section as if fully set forth herein.

107.   The distribution of *The Homeless Voice* and receipt of donations are protected First Amendment activities.

108.   The Commercial Activity Ban is not narrowly tailored to achieve a significant government interest, and it does not leave open ample alternative channels for these First Amendment activities.

109.   The Foundation does not sell its newspaper, and only challenges this provision to the extent its activities could be deemed commercial.

110.   The City's enactment and its past and continued enforcement of the ban have proximately caused the deprivation of Plaintiff's rights secured by the First Amendment.

## COUNT 6 – FIRST AMENDMENT
### Sign and Vest Requirements

111.   Plaintiff realleges and incorporates the allegations in all paragraphs preceding the Causes of Action section as if set forth herein.

112.   If an applicant obtains a permit for charitable solicitation, the terms of the permit, and the applicant's safety plan, must include the safety methods published by the City's Traffic Engineer.

113.   The City's Traffic Engineer has published the list of safety methods, which include, among other things, 1) wearing a safety vest, and 2) posting signs, as detailed above.

114.    The sign and vest requirements are not narrowly tailored to achieve a significant government interest, and do leave open ample alternative channels for these First Amendment activities.

115.    The City's enactment and its past and continued enforcement of the requirements have proximately caused the deprivation of Plaintiff's rights secured by the First Amendment.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff respectfully requests and seeks the following relief:

A.    A declaration that the following provisions of the Jacksonville City Code violate the First Amendment to the U.S. Constitution facially and as applied to Plaintiff:

(1) Code § 804.807(h) (Solicitation Ban)

(2) Code § 804.1701 (b)(1) (Median Ban)

(3) Code § 804.1701 (b)(2) (Physical-Exchange Ban)

(4) Code § 804.1701 (b)(3) (Commercial-Activity Ban)

(5) The sign and vest requirements published by the City Traffic Engineer.

B.    A preliminary and permanent injunction prohibiting the City from enforcing these provisions.

C.    A declaration that the City's permitting scheme in Code § 804.807 is unconstitutional in violation of the First Amendment, both facially and as applied to Plaintiff.

D.    Should any of the bans in the Code provisions listed above remain in effect, a preliminary and permanent injunction modifying the permitting scheme to allow Plaintiff to obtain a permit upon request that allows Plaintiff to engage in its desired activities without restrictions.

E.     All damages permitted by law, including but not limited to compensatory and nominal damages.

F.     An award to the Plaintiff from the Defendants of reasonable costs, attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988.

G.     An order retaining the Court's jurisdiction of this matter to enforce the terms of the Court's orders. And

H.     Such further and different relief as is just and proper or that is necessary to make the Plaintiff whole.

### JURY DEMAND

Plaintiff demands trial by jury on all counts alleged above.

Respectfully submitted,

Dante P. Trevisani
Florida Bar No. 72912
E-mail: *dtrevisani@floridajusticeinstitute.org*
Ray Taseff
Florida Bar No. 352500
E-mail: *rtaseff@floridajusticeinstitute.org*
Andrew Udelsman
Florida Bar No. 105169
E-mail: audelsman@floridajusticeinstitute.org
Florida Justice Institute, Inc.
PO Box 370747
Miami, Florida 33137
305-358-2081
305-358-0910 (Fax)

By: ___*s/Ray Taseff*_____
        Ray Taseff

Benjamin Stevenson
Florida Bar No. 598999
Email: *bjs@stevenson-legal.com*
Stevenson Legal, PLLC
919 Panfeiro Dr.
Pensacola Beach, Florida 32561-2247

702-206-6708

**Attorneys for the Plaintiff**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Jacksonville Division**

| | |
|---|---|
| THE COSAC FOUNDATION, doing business as The Homeless Voice, | ) ) ) |
|    Plaintiff, | ) ) |
| vs. | )     Case No. ) |
| CITY OF JACKSONVILLE, FLORIDA, a Florida municipal corporation, | ) ) ) ) |
|    Defendant. | ) |

_____

## DECLARATION OF SEAN CONONIE

     I, Sean Cononie, make this Declaration Under Penalty of Perjury, and declare that the statements below are true, and state:

     My name is Sean Cononie. I am the Chief Executive Officer and a Member of the Board of Directors of the Cosac Foundation, Inc. I have reviewed the Verified Complaint above, and state that the facts which pertain to the Cosac Foundation, Inc., are true and accurate to the best of my knowledge and belief.

     I understand that a false statement in this declaration will subject me to penalties for perjury.

     I declare under penalty of perjury that the foregoing is true and correct.


*/s/ Sean Cononie*_____      Date: <u>February 13, 2024</u>
Sean Cononie