UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THE COSAC FOUNDATION, INC.,
doing business as The Homeless Voice,

 Plaintiff,

v.                                    Case No.: 3:24-cv-213-TJC-JBT

CITY OF JACKSONVILLE, FLORIDA,
a Florida municipal corporation

 Defendant.

_____/

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Defendant, City of Jacksonville ("City"), responds to Plaintiff, The Cosac Foundation's ("Foundation"), Motion for Preliminary Injunction, Doc. 2 ("Motion").  For the reasons detailed below, the Motion should be denied.

## I.    INTRODUCTION

While the "right to free speech is vital," it does not guarantee "carte blanche [freedom] to solicit charity on roadways however" one wishes. *Vigue v. Shoar*, 494 F. Supp. 3d 1204, 1229 (M.D. Fla. 2020).  Likewise, "[i]t requires neither towering intellect nor an expensive 'expert' study to conclude that mixing pedestrians and temporarily stopped motor vehicles in the same space at the same time is dangerous." *News & Sun-Sentinel Co. v. Cox*, 702 F. Supp. 891, 900 (S.D. Fla. 1988). Such are the conflicts presented in this matter.

Here, the Foundation alleges the City's pedestrian and vehicular safety ordinances unconstitutionally infringe on its ability to engage in charitable solicitation throughout most of the City.  It is wrong.  The challenged ordinances do not impact the Foundation's universal ability to solicit on City sidewalks.  Rather, out of a concern for pedestrian safety, the ordinances merely limit the Foundation's ability to engage in charitable solicitation in and on the City's busiest roadways.  Moreover, the Foundation can engage in solicitation on those roadways so long as it does so within a reasonable set of time, place, and manner restrictions embodied in the City's Charitable Solicitation Permit (CSP) process.  The City's regulation of pedestrians on some of the area's most trafficked roadways is narrowly tailored, while nonetheless ensures the Foundation has ample other alternatives to engage in charitable speech.  The Foundation's Motion therefore, is unfounded, and should be rejected by this Court.

### A.    The Challenged Ordinances

The Foundation challenges portions of the City's Traffic Code, particularly Part 8: Pedestrian Rights and Duties, and Part 17: Pedestrian and Vehicular Safety.  *See* Ord. 2022-574-E (Ex. 1); *see also* Jacksonville Ordinance Code 804.807; 804.1701 ("Ord. Code").  Part 8's intent is to "provide a safe pedestrian environment to traverse the City and County Roads."  Ord. Code. 804.802.  Likewise, Part 17 addresses the high rate of pedestrian deaths and

injuries on the City's highly trafficked roadways.  *See* Ord. 2022-574-E at 1-2.

More specifically, Part 17 regulates pedestrian presence on the City's most frequented throughfares, identifying those "designated roadways" as

> the interstate/intrastate system (including interstate/intrastate entrance and exit ramps), and arterial and collector roadways and rights-of-way. . . . It also encompasses the first 440 feet of local roadways intersecting with these designated roadways and any areas within the rights-of-way not designated or intended for pedestrian use.

Ord. Code 804.1701(a)(1).  Arterial and collector roadways are defined by the Florida State Department of Transportation.  *See* Ord. Code 804.102(n); 804.1701(a)(1); *see also* FLA. STAT. §§ 334.03(1), (4), and (14).  Likewise, rights-of-way are defined by Florida law and City code.  Those sources define "rights of way" as property owned by the City in fee or easement for "street, drainage, utilities, ingress/egress, and other needs of the City" as well as for the "transportation of people or property from place to place."  *See* FLA. STAT. § 334.03(21); Ord. Code 711.103.  However, this general definition is limited by language in section 804.1701(1)(a) noting that areas "designated or intended for pedestrian use" are not included in the definition of "designated roadways."  Accordingly, section 804.1701 regulates approximately 2,536 miles of the total 5,426 miles of City roadways and their associated rights-of-ways, but excludes sidewalks.[1]  *See* Ex. 2 at ¶ 19 (Salem Dec.).

---

[1] Pursuant to section 614.138 of the City Code, solicitation is also prohibited within the City's Central Core, and is included in the numbers above.  Salem Dec. at ¶ 8.

Section 804.1701 then prohibits activities on designated roadways. Those activities include occupation of medians by pedestrians; the physical interaction between pedestrians and occupants of motor vehicles; and the commercial use of public rights-of-way. *See* Ord. Code 804.1701(b)(1)-(3). The Traffic Code then exempts a variety of activities from the prohibitions laid out in section 804.1701(b)(1)-(3). *See* Ord. Code 804.1701(c). As relevant here, the Code details that "[a] person or entity engaged in charitable solicitations while in possession of a valid permit issued pursuant to Section 804.807 . . ." may be present on designated roadways. Ord. Code 804.1701(c)(6).

Section 804.807 outlines the permitting process for those who seek to engage in charitable solicitation on designated roadways. The permitting process is detailed on the City's Department of Public Works, Traffic and Engineering Division website where applicants can complete an application.[2] *See* Ex. 3 at ¶¶ 10-17 (LeDew Dec.). The CSP asks for the applicant's name, date of birth (if an individual), registration number (if an organization), address, contact information, solicitation beneficiary, additional participants' names and dates of birth, location of solicitation, and solicitation dates and hours. *See id.* at ¶ 11. Applicants are also required to fill out a Traffic Plan and agree to indemnify and hold harmless the City, as well as provide proof of

---

[2] *See* https://www.jacksonville.gov/departments/public-works/traffic-engineering.aspx, last visited April 5, 2024.

meeting certain insurance coverage requirements. *Id.* at ¶¶ 12-17. The website provides applicants with a sample Traffic Plan for completion, as well as a copy of the City-approved indemnification and hold-harmless agreement. *Id.* at ¶¶ 6, Attach A; 13, Attach. B.

The Traffic Plan asks applicants to detail the street names and intersections where they will be engaged in charitable solicitation, and to identify on the plan where each participating solicitor will be stationed. *Id.* at ¶¶ 7-8. The Traffic Plan also details that participating solicitors wear a bright orange or fluorescent green safety vest, and that the permit holder post warning signs in the area where they are seeking solicitations. *Id.* at ¶ 9. Individuals who appropriately demonstrate indigency status are excused from the insurance requirement and are provided free vests and warning signs. *Id.* at ¶ 17; *see also* Ord. Code 804.807(a)(7).

City staff in the Traffic and Engineering Division and Risk Management Division review the permit applications for compliance with the permit scheme. *See* LeDew Dec. at ¶ 18; Ex. 4 at ¶¶ 3, 8-10 (Malone Dec.). If an applicant completes the CSP, Traffic Plan, and hold harmless agreement, and also provides proof of having the appropriate insurance coverage, the permit is granted. *See* LeDew Dec. at ¶ 19; Malone Dec. at ¶¶ 3, 8-10.

The permit does not allow charitable solicitation by individuals under the age of 18 or solicitation outside of daylight hours. Ord. Code 804.807(a)(5)-

(6).  Likewise, an applicant is limited to two permits per calendar year, each permit not to exceed 36 hours in any 72-hour consecutive period.  *Id.* at 804.807(a)(3), (f).  Permit holders are also bound to comply with other City ordinances and must carry a copy of the permit and certificate of insurance while engaged in charitable solicitation.  *Id.* at 804.807(b), (d).  Individuals or organizations who engage in charitable solicitation without a permit in the right-of-way of any designated roadway "shall be punished by the Sheriff by a fine not exceeding $50 for a first offense and $250 for a second or subsequent offense."  Ord. Code 804.807(h).

Since instituting section 804.807's permit scheme, the City has received eight applications, and has rejected only one for failure to provide the appropriate insurance documentation.  *See* LeDew Dec. at ¶¶ 20-21.

## B.    The Foundation's claims

On February 26, 2024, the Foundation brought suit against the City challenging the constitutionality of Ord. Code 804.807 and 804.1701.  Doc. 1 (Complaint).  In Count I, the Foundation alleges that section 804.807(h) unconstitutionally bans all solicitation throughout the City.  *Id.* at ¶¶ 75-84.  In Count II, it challenges the permitting scheme in section 804.807.  *Id.* at ¶¶ 85-95.[3]  In Counts III, IV, and V, it alleges that the bans laid out in section

---

[3] The Foundation's Complaint runs afoul of the Eleventh's Circuit's prohibition of shot-gun pleadings.  *See Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015).  *See also* Doc. 1 at ¶¶ 85, 96, 102, 106, 111.

804.1701(b)(1)-(3) represent unlawful time, place, and manner restrictions. *Id.* at ¶¶ 96-110. Finally, in Count VI, the Foundation challenges the vest and sign requirements. *Id.* at ¶¶ 111-115. The Foundation alleges the overall statutory scheme "has effectively banned requesting donations and distributing literature through vast portions of City sidewalks and streets, and has prohibited the Foundation from engaging in core First Amendment activities." Motion at 3. The Foundation also contends the charitable solicitation permitting scheme is unconstitutional, *id.* at 13, and requests this Court preliminarily enjoin the City from enforcing its provisions. *Id.* at 20.

The Foundation is unable to satisfy the requirements for a preliminary injunction.[4] First, section 804.1701(b)(1)-(3) constitutes a constitutional time, place, and manner restriction. Second, the Foundation wholly misconstrues section 804.807(h). Third, the Foundation is unable to show it is likely to succeed in challenging the permitting scheme laid out in section 804.807, or that the associated vest and sign restrictions are constitutionally infirm.

---

[4] It is well established that a

> district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*FF Cosms. FL Inc. v. City of Miami Beach, FL*, 129 F. Supp. 3d 1316, 1320-21 (S.D. Fla. 2015) (quoting *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.2000) (*en banc*)). When the government is a party, the last two factors are combined. *Gonzales v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020).

Finally, the Foundation is unable to show that the remaining preliminary injunction factors weigh in its favor.  The City therefore respectfully requests that the Court deny the Foundation's Motion.

## II.   THE   FOUNDATION   CANNOT   DEMONSTRATE   A LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   First Amendment Challenge to Sections 804.1701(b)(1)-(3)

In Counts III – V of its Complaint, the Foundation asserts subsections (1)-(3) of section 804.1701(b) are unconstitutional time, place, and manner restrictions.  The Foundation contends those subsections violate one's ability to engage in First Amendment protected activities.  Complaint at ¶¶ 96-110; Motion at 7.  The Foundation is incorrect.

Streets and roadways are traditional public fora "held in trust for use of the public and . . . have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014).  *See also Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011); *Smith v. City of Ft. Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999).  However,

> even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Ward v. Rock Against Racism*, 491 U.S. 781, 791, (1989) (internal quotations and citations omitted). *See also Bloedorn*, 631 F.3d at 1236; *Smith*, 177 F.3d at 956. Section 804.1701(b)(1)-(3) complies with *Ward*'s rubric.

### 1.   Section 804.1701(b)(1)-(3) does not regulate speech.

Subsections (1) – (3) of 804.1701(b) regulate pedestrian presence on portions of designated roadways primarily intended for motor vehicle operation. Subsection (1) prohibits pedestrians from occupying medians on designated roadways, except those pedestrians who are in "the process of lawfully crossing the road in accordance with applicable traffic and safety laws." Ord. Code. 804.1701(b)(1). Subsection (2) details that it is

> unlawful for any person to engage in any physical interaction between a pedestrian and an occupant of a motor vehicle, including but not limited to the transfer of any product or material, while the motor vehicle is not legally parked and is located on the traveled portion of a designated roadway.

*Id.* at 804.1701(b)(2). Finally, subsection (3) states that "[i]t is unlawful to use any public right-of-way for commercial activity." *Id.* at 804.1701(b)(3).

As noted earlier, section 804.1701 regulates pedestrian presence on less than half of City streets and rights-of-way. *See* Salem Dec. at ¶ 21. It does not regulate, however, pedestrian presence, activity, and speech on the immediately adjacent sidewalks associated with those designated roadways. *See* Ord. Code 804.1701(a)(1). Similarly, section 804.1701 does not regulate pedestrian presence, activity, or speech on roadways, associated rights-of-ways

or sidewalks that do not fall within the definition of designated roadways. Hence, the prohibitions in section 804.1701(b) are focused on pedestrian location and activity, not speech.

### 2.   Section 804.1701(b)(1)-(3) is narrowly tailored.

The prohibitions laid out in section 804.1701(b) are narrowly tailored. "To be valid, a time, place, or manner restriction must . . . be narrowly tailored to advance the government's substantial interest." *Pine v. City of W. Palm Beach, FL*, 762 F.3d 1262, 1269 (11th Cir. 2014). The regulation "must not burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* It "need not be the least restrictive or least intrusive means of serving the government's interests. But the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 1269–70 (citing and quoting *McCullen*, 573 U.S. at 486 and *Ward*, 491 U.S. at 798-99). *See also Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 11 F.4th 1266, 1295 (11th Cir. 2021); *Int'l Caucus of Lab. Comm. v. City of Montgomery*, 111 F.3d 1548, 1551 (11th Cir. 1997).

In demonstrating that a regulation addresses a significant interest, "the government must come forward with some *objective* evidence in support of its ordinance." *Messina v. City of Ft. Lauderdale, FL*, No. 21-CV-60168, 2024 WL 301574, at *20 (S.D. Fla. Jan. 26, 2024) (emphasis in original). "To

demonstrate the significance of its interest, the City is not required to present detailed evidence of pedestrian or traffic flow on or around specific sidewalks; the City is entitled to advance its interests by arguments based on appeals to common sense and logic." *Int'l Caucus of Lab. Comm.*, 111 F.3d at 1551 (citing *Multimedia Publ'n Co. of S. Carolina, Inc. v. Greenville–Spartanburg Airport,* 991 F.2d 154, 160 (4th Cir.1993)).  "This burden is not a rigorous one," *Buehrle v. City of Key West*, 813 F.3d 973, 979 (11th Cir. 2015), nor "require[s] scientific or statistical proof of the wisdom of the legislature's course." *Cosac Found., Inc. v. City of Pembroke Pines*, No. 12-62144-CV, 2013 WL 5345817, at *17 (S.D. Fla. Sept. 21, 2013) (citing *Ginsberg v. New York,* 390 U.S. 629, 642 (1968)).  Likewise, "a governmental entity, charged with the well-being of its citizens, shouldn't have to wait for accidents to happen (or for people to die) before it can implement the regulations it believes are necessary to promote the general welfare." *McDonald v. City of Pompano Beach, FL*, 556 F. Supp. 3d 1334, 1360 (S.D. Fla. 2021).  *See also Evans v. Sandy City*, 944 F.3d 847, 858 (10th Cir. 2019); *Cosac Found., Inc.*, 2013 WL 5345817 at *18.

Here, the challenged regulations advance the City's substantial interest in providing "a safe pedestrian environment to traverse the City and County Roads," Ord. Code 804.802, and to address the high rate of pedestrian deaths and injuries on the City's most trafficked roadways.  *See* Ord. 2022-574-E at 1-2.  "[T]traffic control and safety are substantial government goals which serve

legitimate interests for the exercise of police power." *News & Sun-Sentinel Co.*, 702 F. Supp. at 900. *See also Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015); *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000); *Messina*, 2024 WL 301574 at *19; *Cosac Found., Inc.*, 2013 WL 5345817 at *15; *Vigue*, 494 F.Supp.3d at 1229; *Watkins v. City of Arlington*, 123 F. Supp. 3d 856, 867 (N.D. Tex. 2015).

In passing sections 804.807 and 804.1701, the City Council relied on and cited to numerous studies detailing the City's high numbers of pedestrian roadway deaths and injuries. These studies indicate that in 2022 the City of Jacksonville ranked sixth in the nation "for pedestrian deaths as a result of being struck by vehicles on Jacksonville streets." Ord. 2022-574-E at 1. Likewise, data "from the Florida Department of Transportation, from the time period of January 1, 2018 through December 31, 2018, [noted] Duval County experienced a total of 471 vehicle/pedestrian crashes, from which there were 34 fatalities." *Id.* at 2. Similarly, recent "data from the Florida Department of Transportation, [indicated that] from the time period of January 1, 2021 through December 31, 2021, Duval County experienced a total of 492 vehicle/pedestrian crashes, from which there were 48 fatalities." *Id.* Additional statutory findings indicated that "the North Florida Transportation Planning Organization has conducted studies and made recommendations regarding Duval County's pedestrian/vehicle safety issues and remedies in

2018 and 2019," *id.*, "the City has implemented a number of the recommendations through its Context Sensitive Streets Standards Committee and the Bicycle and Pedestrian Advisory Committee," *id.*, and "the Jacksonville Sheriff's Office has conducted a detailed intersection analysis to identify site conditions that might contribute to vehicle/pedestrian safety concerns." *Id.* Finally,

> in a study dated September 2021, the Florida Department of Transportation evaluated Florida pedestrian and bicycle safety strategies to combat the comparatively high percentage (Florida is the second highest ranked state in the country for vehicle/pedestrian deaths) and recommended enhanced legislation, regulations, policies and programs to support the overall goal of eliminating fatal and serious injury crashes involving people walking and biking.

*Id.* (internal citations omitted).  Likewise, data collected by the Jacksonville Sheriff's Office indicates that between May 15, 2021 and May 14, 2022, there were 531 vehicular crashes involving pedestrians, and 45 fatalities; between May 15, 2022 and May 14, 2023, there were 506 vehicular crashes involving pedestrians, and 44 fatalities; and between May 15, 2023 to the present (April 1, 2024), there have been 429 vehicular crashes, and 39 fatalities.  *See* Ex. 5 at ¶¶ 10-12 (Clark Dec.).

The City has demonstrated section 804.1701(b)(1)-(3) supports the substantial government interest of enhancing pedestrian safety and traffic control.  *See Int'l Caucus of Lab. Comm.*, 111 F.3d at 1551; *McDonald*, 556 F. Supp. 3d at 1360; *Cosac Found., Inc.*, 2013 WL 5345817 at *17.  In determining

what conduct to regulate and where to regulate, the City relied on "objective evidence to support its ordinance." *Messina*, 2024 WL 301574 at *20.

"Whenever government draws a line, there will be cases close to the mark. One can always claim that a small change could have accommodated more conduct, at a little sacrifice in the government's objective. Choosing how much to accommodate at what sacrifice in other objectives is precisely the business of government . . . ." *Waggoner v. City of Dallas*, No. 3:22-CV-2776-E-BK, 2023 WL 5516474, at *10–11 (N.D. Tex. July 20, 2023), *report and recommendation adopted sub nom. Waggoner v. City of Dallas*, No. 3:22-CV-02776-E-BK, 2023 WL 5517220 (N.D. Tex. Aug. 25, 2023).   Likewise, cities "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems."  *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1275 (5th Cir. 1988).  As such, the Court should decline "to second guess the City's assessment" that section 804.1701(b)(1)-(3) was necessary to promote pedestrian safety and traffic control.  *Cosac Found., Inc.*, 2013 WL 5345817 at *18; *see also McDonald*, 556 F. Supp. 3d at 1359-60.  *Cf. Messina v. City of Ft. Lauderdale, FL*, 546 F. Supp. 3d 1227, 1249 (S.D. Fla. 2021) (court declined to find ordinance narrowly tailored where city merely operated "under the premise" and assumption that it could promote public safety without additional supporting evidence).

The Foundation argues that section 804.1701(b)(1)-(3) is not narrowly

tailored because the City cannot "explain why enforcing state law about interfering with traffic will not be sufficient," and that the ordinances are also geographically overinclusive.  Motion at 10.  The Foundation is wrong on both arguments.  As to the first, the Foundation does not cite to any "state law[s] about interfering with traffic," but the City presumes it is referring to Florida Statutes 316.2045 and 337.406.  Those statutes have both been adjudicated unconstitutionally suspect, and hence do not provide the City with viable alternative means of pedestrian protection.  *See Vigue*, 494 F. Supp. at 1232; *Chase v. City of Gainesville*, No. 1:06-cv-044-SMP/AK, 2006 WL 2620260, at *3 (N.D. Fla. Sept. 11, 2006); *Bischoff v. FL*, 242 F. Supp. 2d 1226, 1260 (M.D. Fla. 2003); *News & Sun Sentinel Co.*, 702 F. Supp. at 902.

Second, the Foundation's argument that the ordinance's ban is geographically overinclusive does not withstand review.  The geographic area regulated by section 804.1701(b)(1)-(3) encompasses under half of the City's roadways.  This area, moreover, does not include the sidewalks along those roadways.  Likewise, data collected by the Jacksonville Sheriff's Office regarding pedestrian and vehicular accident locations largely correlate with the regulated roadways identified in section 804.1701(a)(1).  *Compare* Salem Dec., ¶ 10, Attach. A *with* Clark Dec., ¶8, Attach. A-C.  Finally, since the ordinance's passage, the percentage of vehicular accidents has dropped 15.5 percent, and fatalities by 11.37 percent.  *See* Clark Dec. at ¶¶ 11-12.  *Compare*

*Gresham*, 225 F.3d at 907 (ordinance that limited regulation to specific spaces was valid); *Cosac Found., Inc.*, 2013 WL 5345817 at *21 (same) *with Reynolds*, 779 F.3d at 231 (ordinance that regulated all county roads burdened more speech than necessary); *Comite De Jornaleros De Redondo v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) (same); *Rodgers v. Stachey*, 382 F. Supp. 3d 869, 883 (W.D. Ark. 2019) (same); *Blitch v. City of Slidell*, 260 F. Supp. 3d 656, 672-73 (E.D. La. 2017) (same).  Based on the foregoing, section 804.1701(b)(1)-(3) is narrowly tailored.

### 3. Section 804.1701(b)(1)-(3) provides ample opportunities for alternative methods of communication.

To the extent section 804.1701(b)(1)-(3) may impact the Foundation's ability to engage charitable solicitation, ample opportunities for alternative methods of communication exist.  The "Constitution requires only that [the City] leave open *an* alternative channel of communication, not *the* alternative channel of communication [the Foundation] desires."  *LaCroix v. Town of Ft. Myers Beach, FL*, 38 F.4th 941, 952 (11th Cir. 2022) (emphases in original) (citations omitted).  Of course, "the alternative channel (or channels) must be adequate and meaningful even if it is not the one [the Foundation] would have chosen.  The speaker must be able to effectively communicate his message to the intended audience in the face of the Ordinance's restrictions."  *LaCroix*, 38

F.4th at 952.  The alternative channel however, "does not have to be the speaker's first choice." *McDonald*, 556 F. Supp. 3d at 1360.

As referenced elsewhere, the public fora regulated by section 804.1701(b)(1)-(3) leaves nearly all City sidewalks open for the Foundation to engage in its chosen speech, including those along designated roadways. Likewise, more than half of City streets and their associated rights-of-ways remain free for solicitation.  *See e.g., Evans*, 944 F.3d at 860; *Int'l Caucus of Lab. Comm.*, 111 F.3d at 1552; *Cosac Found., Inc.*, 2013 WL 5345817 at \*20; *Doucette v. City of Santa Monica*, 955 F. Supp. 1192, 1208 (C.D. Cal. 1997). Likewise, a plethora of City parks, plazas, and public spaces remain available for the Foundation's use.  Therefore, ample opportunities for alternative methods of communication remain for the Foundation.

As such, section 804.1701(b)(1)-(3) is a constitutional time, place, and manner restriction, and the Foundation is unable to succeed in its action against the City for Counts III –V.

## B.    First Amendment Challenge to Section 804.807(h)

In Count I of their Complaint, the Foundation asserts that section 804.807(h) violates the First Amendment because it "prohibits solicitation while it allows . . . holding political signs and having political discussions." Motion at 11.  Likewise, the Foundation asserts that subsection (h) "applies to every street and sidewalk . . . ."  *Id.* at 13.  The Foundation is wrong and has

created a factually inaccurate strawman.  It reads section 804.807(h) in isolation, segregated from its predicate definitions, cross-referenced limitations, and broader statutory context, and strips subsection (h) of the City's legislative intent.  When read correctly, subsection (h) is properly interpreted as the penalty provision for those who seek charitable solicitations without a permit within the rights-of-ways of designated roadways.

"The meaning of [an ordinance] is determined by ascertaining the legislature's intent, and the words used in the statute must be construed in context and considered as a whole in light of the general purpose the statute seeks to accomplish." *Brandon Chrysler Plymouth Jeep Eagle, Inc. v. Chrysler Corp.*, 898 F. Supp. 858, 862 (M.D. Fla. 1995) (citing *Mike Smith Pontiac v. Mercedes–Benz of N. Am.,* 32 F.3d 528, 534 (11th Cir.1994); *Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So.2d 452, 455 (Fla. 1992)).  *See also Pine*, 762 F.3d at 1270; *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010). Stated otherwise, "words take meaning based on their context or their association with other words in the statute, *noscitur a sociis*. Where one of the enumerated terms is a general one, it may be restricted to a narrower sense or less general meaning by the context in which it is used." *DeSisto Coll., Inc. v. Town of Howey-in-the-Hills*, 706 F. Supp. 1479, 1495 (M.D. Fla.), *aff'd sub nom. DeSisto Coll., Inc. v. Line*, 888 F.2d 766 (11th Cir. 1989) (internal citations omitted).  "[T]his intent must be given effect even though it may contradict the

strict letter of the statute." *Lake Haven Mobile Home Owners, Inc. v. Orangeland Vistas, Inc.*, 408 F. Supp. 2d 1231, 1233–34 (M.D. Fla. 2006) (citation omitted).

Section 804.807 is titled "Charitable Solicitations by Permit" and directs that permits must be obtained for "charitable solicitation in the right-of-way of any designated roadway, as defined in Section 804.1701." Ord. Code 804.807(a). By reference, section 804.1701 details that right-of-way areas "designated or intended for pedestrian use" are not included in the definition of "designated roadways." Ord. Code 804.1701(1)(a). Section 804.807 then details the permitting process, *see* Ord. Code 804.807(a)-(g), and ends by indicating that "[s]oliciting in the right-of-way without a valid permit issued pursuant to this Section shall be punished by the Sheriff by a fine not exceeding $50 for a first offense and $250 for a second or subsequent offense." *Id.* at 804.807(h).

The Foundation erroneously contends that section 804.807(h) bans solicitation on all City sidewalks and streets by reading section 804.807(h) sequestered from its companion subsections, as well as the cross-referenced definitional sections laid out in section 804.1701. It also ignores the clarity of intent laid out in the Whereas clauses of the ordinance. Such a reading departs from the standard canon of statutory construction that a statute should be interpreted by "ascertaining the legislature's intent, and the words used in the

statute must be construed in context and considered as a whole in light of the general purpose the statute seeks to accomplish." *Brandon Chrysler Plymouth Jeep Eagle, Inc.*, 898 F. Supp. at 862; *see also Pine*, 762 F.3d at 1270; *Edison*, 604 F.3d at 1310; *DeSisto Coll., Inc.*, 706 F. Supp. at 1495.

The Foundation's interpretation also "raises serious constitutional problems," and should prompt this Court to "construe the law to avoid those problems so long as the reading is not plainly contrary to legislative intent." *Pine*, 762 F.3d at 1270. "When faced with more than one plausible interpretation of a law, [the court should] apply the reasonable presumption that [the legislature] did not intend the alternative which raises serious constitutional doubts." *Id.* at 1270–71 (citations and quotations omitted). *See also Frisby v. Schultz*, 487 U.S. 474, 483 (1988). An accurate interpretation of section 804.807(h) requires that it be read in context with the other portions of section 804.807, as well as its companion section 804.1701. So doing, section 804.807(h) is properly understood as detailing the penalty for engaging in charitable solicitation without a permit on designated roadways, which by definition regulates under half of the City's streets, excludes portions intended for pedestrian use, and leaves available the rest of the City's roadways.

The Foundation has raised no viable argument challenging the validity of subsection (h)'s penalty provision, nor can it. Therefore, it is unable to demonstrate a likelihood of success on the merits of this claim.

## C.     First Amendment Challenge to the Permitting Scheme and Vest/Sign Requirements

The Foundation asserts in Counts II and IV that section 804.807's permitting scheme is unlawful, as are the sign and vest requirements.  The Foundation cannot show a likelihood of success on the merits for either claim.

A permitting scheme is constitutional when it regulates the time, place, and manner of speech, contains precise and objective standards, and does not vest unbridled discretion in decision makers to limit access to a particular public forum.  *See Riley v. Nat'l Fed. Of the Blind of N.C.*, 487 U.S. 781, 802 (1988); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969); *Bloedorn*, 631 F.3d at 1236-37; *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999).  In evaluating the validity of a permitting scheme, Courts may look to the actual policies and practices employed by government decision makers, rather than solely the text of the ordinance.  *See Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("we must consider the [government's] authoritative constructions of the ordinance, including its own implantation and interpretation of it."); *Bloedorn*, 631 F.3d at 1237 ("We consider the actual policies and practices employed by the University, not just the policy's text.").

The instant permitting scheme allows charitable speech in designated roadways where pedestrian presence is otherwise generally prohibited.  *See*

21

Ord. Code 804.807.  In allowing such speech on designated roadways, the permitting scheme does nothing more than regulate the time, place, and manner by which individuals may seek charitable donations.  None of the permitting requirements vest unbridled discretion in the City's decision makers, nor present "onerous or intrusive provisions that serve no purpose other than to deter" charitable solicitation.  Motion at 17.

Initially, the CSP lays out precise and objective requirements that applicants must detail in their Traffic Plan to demonstrate that their charitable solicitation "will not interfere with the safe and efficient movement of traffic and . . . will cause no danger to the public." Ord. Code 804.708(a)(7).  Upon the enactment of section 804.807, the City's Traffic Engineer "develop[ed] a definitive list of safety methods to identify and provide visibility to all individuals who will be operating in the right-of-way and to alert traffic approaching the intersection(s) or road segment(s) where such charitable solicitations will be occurring. Such safety methods shall be included in the applicant's safety plan." *Id.* at 804.807(a)(2).  That list of definitive safety methods is embodied in the sample Traffic Plan available to applicants on the Traffic Engineering Department website.[5]  The Traffic Plan asks applicants to detail the street names and intersections where they will be engaged in

---

[5] *See* https://www.jacksonville.gov/departments/public-works/traffic-engineering.aspx, last visited April 4. 2024.

charitable solicitation, and to identify where each participating solicitor will be stationed.  *See* LeDew Dec. at ¶¶ 7-9.

Permit recipients must also wear a bright orange or fluorescent green safety vest, and post warning signs in the area where they are requesting charitable solicitations.  *Id.* at ¶ X.  If an individual is deemed indigent, the City supplies vests and signs.  *See* Ord. Code 804.807(7); LeDew Dec. at ¶ 8. The vest and sign requirements are in no way onerous, intrusive, or designed to deter homeless or destitute individuals from seeking charitable solicitations. *See* Motion at 17.  Rather, the requirement is designed to afford additional safety to those individuals at no cost.  Indeed, the Foundation has itself recognized this safety concern and requires that its own solicitors wear reflective vests when engaged in street solicitation.  Complaint at ¶ 17.

The hold-harmless provision is equally precise and objective.  *See* Ord. Code 804.807(a)(4) ("The applicant shall provide an indemnification and hold harmless for the organization, if applicable, and all individual solicitors in favor of the City in a form satisfactory to the City attorney.").  That satisfactory form is posted on the website, the terms of which are also printed on the on-line application.  *See* LeDew Dec. at ¶ 13-14, Attach B.  Applicants must download the form, complete it, and include it with their application.  *Id.* at ¶¶ 12, 19.  So long as applicants submit a Traffic Plan, the pre-printed hold-harmless form, and provide the other information detailed in the CSP, a permit

is granted.  *Id.* at ¶ 19.

Taking into account "the actual policies and practices employed by" the City, and not just the text of the challenged ordinance, *Bloedorn*, 631 F.3d at 1237, the City's permitting process does not vest unbridled discretion in decision makers.  At most, when an applicant completes and provides the required paperwork to the City, decision makers fulfill the ministerial task of confirming that the application requirements are met, and then grant the permit.  *See* LeDew Dec. at ¶ 19; Monroe Dec. at ¶¶ 3, 8-10.  *See also Lady J. Lingerie, Inc.*, 176 F.3d at 1362; *Wacko's Too, Inc. v. City of Jacksonville*, 658 F. Supp. 3d 1086, 1122 (M.D. Fla. 2023).

Moreover, the permit's temporal limitations do not undermine the scheme's validity.  *See* Motion at 17.  While applicants are limited to two permits per year, each permit period not to exceed a total of 36 hours over a 72 hour period, *see* Ord. Code 804.807(a)(3), (f), this time frame applies only to charitable solicitation that occurs on rights-of-ways on designated roadways. Individuals or organizations may still engage in charitable solicitation without any time limitations on City sidewalks, as well as on the many City roads and other public spaces not regulated by sections 804.807 and 804.1701.

Finally, the insurance requirement does not render the CSP invalid.  The Foundation challenges the City's insurance and indemnification requirements in section 804.807(e)(7) as being unconstitutionally excessive, citing *Central*

*Florida Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1523 (11th Cir. 1985), and *Pritchard v. Mackie*, 811 F. Supp. 665, 667-68 (S.D. Fla. 1993). The Foundation argues that because these provisions are not "nominal charges" for the use of city streets, they violate the First Amendment. Motion at 18. The Foundation is incorrect. The insurance and indemnification requirements exist for the purpose of protecting the City from liability and holding it (and its taxpayers) harmless from permitted solicitation activities on particularly busy streets. There is "no evidence" that the Code requirements are "excessive." *Id.* Instead, they are standard and reasonable for these activities. *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F. Supp. 1257, 1282-83 (11th Cir. 2006) (upholding similar insurance requirements for particularly large festivals). Moreover, the City's insurance terms do not change or differ based on the type of speaker seeking a CSP, nor are they subjectively reviewed by City decision makers. *See* LeDew Dec. at ¶ 19; Monroe Dec. at ¶¶ 3, 8-10.

Section 804.807(e)(7) requires bodily injury and property damage coverage having at least $1 million limits for solicitation activities on busy designated roadways within the City. Persons who are determined indigent are exempt from this requirement. *See* Ord. Code 804.807(a)(7). There is nothing unconstitutional about requiring entities like the Foundation to carry such coverage for solicitation activities on particularly busy roadways and rights-of-way within the City, where a high risk of bodily injury or property

damage is present.  This is not an excessive "charge" for First Amendment activities; it is basic protection for taxpayers regardless and irrespective of the content of solicitors' speech.

The Foundation's reliance on *Walsh* and *Pritchard* is misplaced.  Here insurance is required on a content-neutral basis to protect the City from liability for activities which may be particularly dangerous, i.e., walking and soliciting, in highly trafficked areas.  In *Walsh*, the Court struck down the city's requirement that protesters prepay for police protection, where such fees were set at the discretion of the police chief.  *See Walsh*, 774 F.2d at 1523-25. Likewise, in *Prichard*, the district court entered a temporary restraining order after the city refused to grant a permit for a Ku Klux Klan rally without a $1 million liability policy.  The court deemed the city's actions an "as applied" refusal to grant a permit based on the controversial nature of the applicant's speech.  *See Pritchard*, 811 F. Supp. at 668.  Neither case applies here.

The City's ordinance requires insurance coverage for activities regardless of content or the entity of the speaker, and generally requires this same type of coverage for a host of different events that pose the risk of injury or damage.  *See* Monroe Dec. at ¶ 6.  Requiring such coverage for events that pose particular safety risks is not unconstitutional.  *See, e.g., Sullivan v. City of Augusta*, 511 F.3d 16, 35-36 (1st Cir. 2007) (holding that city ordinance requiring parade applicants to pay for traffic control and cleanup was a

reasonable time, place and manner restriction on its face, as it did not give police discretionary authority); *Miller v. City of Excelsior, Minn.*, 618 F. Supp. 3d 820, 840 (D. Minn. 2022) (holding that sidewalk preacher did not have likelihood of success on claim that city liability insurance requirement with $1,000,000.00 per occurrence limit was unconstitutional as requirement would not be applied to his activities); *Black Heritage Soc'y v. City of Houston*, No. H-07-0052, 2007 WL 9770639, at *15-16 (S.D. Tex. Dec. 4, 2007) (upholding a content-neutral insurance coverage requirement with minimum of $1 million limits for parades with higher safety risks, given City's significant interest in protecting against damage to public property and personal injury) *but see Courtemanche v. General Services Admin.*, 172 F. Supp. 2d 251, 269-71 (D. Mass. 2001) (stating that while insurance requirements are constitutional if they are non-discriminatory and non-discretionary, insurance requirement that contained content-based risk analyses that did not otherwise reduce risks of harm was unconstitutional).

Moreover, limits of $1 million per occurrence are standard for such coverage. *See Black Heritage Soc'y*, 2007 WL 9770639 at *15. The City is simply protecting itself from liability across the board, regardless of the applicant. The City is not, as suggested by the Foundation, unconstitutionally "charging" for First Amendment activities at the discretion of City officials. Motion at 18-19. The insurance and indemnification requirements are

constitutional, both on their face and as applied to the Foundation.

The permitting scheme laid out in section 804.708 is constitutional.  It does not vest unbridled discretion in City decision makers, and merely regulates the time, place, and manner of charitable solicitation on a subset of the City's roadways.  Accordingly, the Foundation is unable to show a substantial likelihood of success on the merits of its claims.  Section 804.1701(b)(1)-(3) is a valid time, place, and manner restriction.  Section 804.807(h) does not ban solicitation throughout the entire City; and  section 804.807's permitting scheme is valid, as are the vest and sign requirements.

## III.  THE REMAINING PRELIMINARY INJUNCTION FACTORS TIP IN THE CITY'S FAVOR

The City acknowledges that "that an ongoing violation of the First Amendment constitutes an irreparable injury." *FF Cosms. FL, Inc.*, 866 F.3d at 1298 (citing *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976)).  However, the Foundation is not prohibited in any manner from seeking charitable contributions along nearly all City sidewalks.  Additionally, over half of the City's roadways (as well as the numerous other public spaces in the City) do not fall within the ambit of section 804.1701, and therefore are available to the Foundation.  The Foundation can also obtain a permit to solicit on the City's designated roadways and associated rights-of-ways.  In the absence of a showing that the Foundation has a likelihood of success on the merits

28

therefore, any harm suffered by the Foundation, irreparable or otherwise, is questionable.

The City also acknowledges "it is never in the public interest to enforce unconstitutional laws." *Beckwith Elec. Co. v. Sebelius*, 960 F. Supp. 2d 1328, 1350 (M.D. Fla. 2013) (citing *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)). Conversely, there is a public interest in enforcing laws enacted by a democratically selected government. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). Moreover, the challenged ordinances further the substantial government interest of advancing pedestrian safety and traffic control. *See e.g. Reynolds*, 779 F.3d at 229; *Gresham*, 225 F.3d at 906; *Messina*, 2024 WL 301574 at *19; *Cosac Found., Inc.*, 2013 WL 5345817 at *15; *Vigue*, 494 F. Supp. 3d at 1229; *Watkins*, 123 F. Supp. 3d at 867. If the City is unable to enforce the challenged aspects of the Traffic Code, it, and its citizens, are at risk of experiencing increased numbers of pedestrian injuries and fatalities along the City's busy streets. Again, given that the Foundation cannot demonstrate a substantial likelihood of success on the merits of its challenge to sections 804.807 and 804.1701, a balancing of the harms and consideration of the public interest tips in the City's favor.

29

## IV.    CONCLUSION

The Foundation is not entitled to a preliminary injunction.  It is unable to show a likelihood of success on the merits of its six claims against the City, nor do the other preliminary injunction factors weigh in its favor.  For the foregoing reasons, the City respectfully requests the Court **DENY** the Foundation's Motion.

Respectfully submitted this date, April 5, 2024,

**OFFICE OF GENERAL COUNSEL**
**CITY OF JACKSONVILLE**

*/s/Mary Margaret Giannini*
**MARY MARGARET GIANNINI**
ASSISTANT GENERAL COUNSEL
Florida Bar No. 1005572
(Lead Counsel)
**CRAIG FEISER**
ASSISTANT GENERAL COUNSEL
Florida Bar No.: 164593
117 West Duval Street, Suite 480
Jacksonville, Florida 32202
Telephone:  (904) 255-5100
Facsimile:   (904) 255-5120
MGiannini@coj.net; EReynolds@coj.net
CFeiser@coj.net; BOsburn@coj.net
*Counsel for City of Jacksonville*