UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

COSAC FOUNDATION, INC.,

    Plaintiff,

v.                                       Case No.: 3:24-cv-213-TJC-JBT

CITY OF JACKSONVILLE,
FLORIDA,

    Defendant.

_____/

**COSAC FOUNDATION'S AMENDED\* REPLY
IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

    Speech must not be sacrificed for efficiency or on assumptions. Vehicle-pedestrian crashes happen. Yet, before restricting speech to reduce them, the City of Jacksonville must show that the banned First Amendment activity causes the crashes. It hasn't. It has failed to carry its burden to show, with objective evidence, that the bans are narrowly tailored to advance its traffic-safety ends. Without this evidence, its ordinance lacks a "close fit between ends and means." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). Its Ordinance may cure the "problem" of the discomfort drivers have when seeing and hearing about homelessness, *see infra* note 1, but the Ordinance does not contribute effectively to the City's claimed problem. Instead, it substantially burdens First Amendment activity without ample

---

    \* Amendment is to footnote 2 only.

alternative channels. And the Ordinance's permitting scheme—relaxing the prohibitions for three days, twice a year—does not save the City. It grants unbridled discretion to officials not cured later by City officials' self-restraint.

The Parties appear to agree on several points. (1) The banned activity occurs in a traditional public forum. *Compare* Mot. (ECF 2) at 6-7 *with* Resp. (ECF 18) at 8, 17. (2) The City's bans regulate First Amendment activities. *Compare* Mot. at 4-6 (2 pages of argument) *with* Resp. at 9 (no supporting argument). *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (waiver through "perfunctory manner without supporting arguments and authority"). (3) Intermediate scrutiny applies. *Compare* Mot. at 7 *with* Resp. at 10. This Reply focuses on the remaining disputes.

**1. No evidence shows that City's bans are narrowly tailored.**

Narrow tailoring requires a "close fit between ends and means." *McCullen*, 573 U.S. at 486. It requires "that the regulation will in fact alleviate [the proffered] harms in a direct and material way," *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994). It requires the City to focus on the crashes' causes that lead to "the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988). Additionally, it requires the City to give

serious consideration to "less intrusive tools readily available." *McCullen*, 573 U.S. at 494.

These are not empty mandates satisfied by speculation, logic, or legislative conclusions. The City "must do more than simply posit the existence of the disease sought to be cured." *Messina v. City of Fort Lauderdale, Florida*, 21-CV-60168, 2024 WL 301574, at *20 (S.D. Fla. Jan. 26, 2024). As the City correctly concedes, it must "come forward with some *objective* evidence in support of its ordinance." Resp. at 10 (quoting *Messina,* 2024 WL 301574 at *20). *See Messina*, at *6, 20, 23 (explaining that City must have evidence showing solicitation causes accidents); *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1222, 227 (10th Cir. 2021) (same).

### 1.1. *No evidence shows that First Amendment activity causes crashes.*

The City does not tender the reports and studies cited in the Ordinance's preamble. Instead, it relies simply on the findings in the Ordinance to justify the bans. Resp. at 12-13. Yet, even accepting the Ordinance's factual findings as "evidence," the City falls short. Neither the findings nor the City's proffered affidavits show that the banned First

Amendment activity causes the crashes or how the bans will materially reduce them.[1]

The City found that vehicular-pedestrian crashes occur at high rates. Ordinance (ECF 1-3) at 1-2. Yet, bare statistics say nothing about whether the First Amendment activities banned under the Ordinance caused, and thus would reduce, the crashes.[2] *See Messina,* 2024 WL 301574 at *8 (crash statistics did not "identif[y] *street solicitation* in *the City* as a potential cause of these problems"). Furthermore, although the City notes the issue has been studied, it makes no findings based on these reports. Ordinance at 2.

The City's tendered affidavits fare no better. They say nothing about the cause of the crashes or why the bans will reduce them. Catherine Clark, ECF 18-5 at ¶ 10-12, attested that the vehicular-pedestrian crashes have

---

[1] Some on the City Council understood the Ordinance's purpose was to curtail roadside panhandling, thus rendering the preamble incongruent with this purpose. Leanne M.G. Cumber (Dist. 5) observed that "everything that has been said was that we are doing the bill specifically because of panhandling." "We are worried about people who are panhandling in the median." Recording of Neighborhoods, Community Services, Public Health and Safety Committee Meeting ("Meeting") (Aug. 15, 2022), https://jaxcityc.granicus.com/player/clip/4417?view_id=1&redirect=true at 52:56–54:03.

[2] The City's General Counsel, Jason Teal, acknowledged the data does not explain why the crashes occurred. Meeting (October 3, 2022), https://jaxcityc.granicus.com/player/clip/4549?view_id=1&redirect=true, at 16:22–17:41.

fallen over the last three years. Yet, she offers no explanation nor notes that rates may rise and fall year-to-year. Clark also mapped where the crashes occurred. *Id.* at 6, 8, 10. As to be expected, where there are more vehicles there are more vehicular-pedestrian crashes. Again, Clark offers no explanation about their cause. Soliman Salem, ECF 18-2 at ¶ 20-21, calculated that the Median and Hand-Exchange Bans apply on roughly 45% of the street-miles in the city and provided a map. He exposes, rather than bolsters, the lack of narrow tailoring. That the Bans apply on roughly 45% of the streets reveals the City's shotgun approach by burdening "a substantial portion" of speech that does "not serve to advance its goals." *McCullen*, 573 U.S. at 486. By comparison, the bans in *Brewer*, 18 F.4th at 1239 (holding the city failed to meet its burden), applied to only 20% of the roadways.

In the face of a dearth of evidence showing that the Ordinance will remedy vehicular-pedestrian crashes, the City proposes common sense and logic. *See* Resp. at 11. Yet, in 2014 *McCullen,* 573 U.S. at 485, made clear that a governmental entity bears an evidentiary burden that goes beyond mere logic. That evidentiary requirement supersedes prior cases cited by the City suggesting that common sense and logic are enough, e.g., *Int'l Caucus of Labor Committees v. City of Montgomery*, 111 F.3d 1548, 1551

(11th Cir. 1997). *See Messina*, 2024 WL 301574, at *6 (ordinance can no longer survive intermediate scrutiny based on common sense and logic alone).

Likewise, the Court should not blindly accept the City's opinion—offered without evidence—that its bans alleviate crashes in a direct and material way. *See* Resp. at 13-14. "Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 843 (1978). *See Messina*, 2024 WL 301574, at *25, 27. The City's opinion must be based on evidence, not "divorced from" it. *Brewer*, 18 F.4th at 1237. Indeed, if opinions and deference prevailed, then courts would have little role in determining an ordinance's constitutionality.

The City has not carried its evidentiary burden to show that the First Amendment activity causes crashes and that banning it will materially advance traffic safety.

### *1.2 No evidence shows the City's serious consideration of less intrusive tools to reduce crashes.*

The City must demonstrate it "seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen*, 573 U.S. at 485. The City only says it implemented a number of the North Florida

Transportation Planning Organization's recommendations ("TPO"). ECF 1-3 at 2:10-12. Yet, it fails to say what TPO recommended, which measures (if any) the City implemented, and whether they were effective. Resp. at 13. *See Messina,* 2024 WL 301574 at *29 ("our City doesn't even tell us what other less intrusive efforts it undertook that eventually proved inadequate"). Before banning First Amendment activities, did it try to enforce a state law prohibition on pedestrians suddenly leaving the curb and walking into moving traffic, or other laws requiring stopping at red lights and yielding to pedestrians? The City neither says nor presents evidence.

## 2. The City's bans leave insufficient alternative channels of communication.

Everyone agrees the City must leave open "adequate and meaningful" channels where Cosac can effectively communicate its message to its intended audience. Mot. at 12-13; Resp. at 16. Because the City already bans solicitation in the city core, Code § 614.138(b), the Solicitation Ban applies on sidewalks, and the Median and Physical-Exchange Bans apply on the "most trafficked roadways," Resp. at 2, 11, the Ordinance fails to do so.

### *2.1 Solicitation Ban applies on sidewalks.*

The plain text of the Solicitation Ban, § 804.807(h), determines where it applies. The City prohibits soliciting in any "right-of-way" without a valid permit. *Id.* In the preceding paragraph, the City defines right-of-way, § 804.807(g), to mean "public rights-of-way" defined in § 804.1701(a), ECF 1-3 at 9:17-20, which looks to § 334.03(21), Fla. Stat., that defines it as land devoted as a "transportation facility," meaning any means for the "transportation of people," § 334.03(30), Fla. Stat. Because a sidewalk is a means for people to travel, it is a right-of-way where the Solicitation Ban applies.

The City argues that—despite not saying so—the "right-of-way" referenced in 804.807(h) should import the "designated roadway" concept from the following section, 804.1701. That limitation appears nowhere in the text. The City knew how to use two separate and defined terms (right-of-way and designated roadway) to apply in different circumstances. It would make no sense—and contravene the plain text—to interpret them identically.

But even applying the City's strained reading does not help it. A designated roadway includes "four feet outside of the shoulders and/or curbs," § 804.1701(a)(1), which unambiguously includes the sidewalk. So,

the City focuses instead on the "encompasses" sentence, ECF 1-3 at 8:25-29, and argues to the contrary. Resp. at 19. A designated roadway "encompasses" not only the vehicular lanes but "any areas within the rights-of-way not designated or intended for pedestrian use." The City reads this *limitation* on the *expansion* of where bans apply (includes rights-of-way that are not sidewalks), to mean sidewalks are excluded from "designated roadways." Resp. at 19. Yet, this limitation on an expansion contradicts and does not overcome the more specific "four feet" definition. Simply, if the City wanted to exempt sidewalks from designated roadways, it could have simply said: "Designated roadways exclude sidewalks." Instead, it explicitly said the designated roadways includes four feet from the curb or shoulder.

Permits do not define prohibitions. True, the Ordinance allows permits to solicit in "the right-of-way if any designated roadway." Code § 804.807(a). That permit (whatever it is called) excuses violations of both the Solicitation Ban, § 804.807(h), and the Median and Physical-Exchange Bans, § 804.1701(b). Yet, the permit does not alter, but only excuses, the prohibitions. Thus, where the Solicitation Ban applies is determined solely by § 804.807(h).

Alternatively, the City invites the Court to ignore the definition and instead look to what the City Council meant. Resp. at 19. Yet, the actual text determines intent. *Robbins v. Garrison Prop. & Cas. Ins. Co.*, 809 F.3d 583, 586 (11th Cir. 2015); *see also In re Al Zawawi*, 22-11024, 2024 WL 1423871, at *7, n. 8 (11th Cir. Apr. 3, 2024) (describing the inherent problems of determining intent from anything but the text).

Courts sometimes interpret a statute to avoid rendering it unconstitutional. Resp. at 20. But that canon "has no application in the absence of ambiguity," *Warger v. Shauers*, 574 U.S. 40, 50 (2014), like here.

Here, the City bans solicitation in the "right-of-way," which unambiguously includes sidewalks. Code § 804.807(h). The Physical Exchange Ban applies on sidewalks within 4 feet of a designated roadway. Thus, sidewalks do not provide an alternative channel.

### 2.2 *Less traveled roads are inadequate.*

The Median and Hand-Exchange Bans apply on the "most trafficked roadways." Resp. at 2, 11. So, the City proposes Cosac conduct its First Amendment activities elsewhere. Yet, the residential or quiet roads are not "adequate and meaningful." *LaCroix v. Town of Fort Myers Beach, Fla.*, 38

F.4th 941, 952 (11th Cir. 2022). They do not allow Cosac to effectively communicate with its intended audience. Mot. at 13. "Just as in real estate, location matters in some constitutional questions." *McGraw v. City of Oklahoma City*, 973 F. 3d 1057, 1079 (10th Cir. 20220). *See also McCullen*, 573 U.S. at 490 (holding unconstitutional buffer zone requiring plaintiffs to stand a substantial distance away from their intended audience).

### 3. The City's permitting scheme is an unconstitutional prior restraint.

The permitting scheme constitutes a presumptively unconstitutional prior restraint. Mot. at 13-15. It does not advance a governmental interest because a permit itself does not ameliorate traffic concerns or make the activity safer. *Id.* at 17. The City ignores that, even if an applicant were able to secure a permit, it only allows solicitations for three days twice a year. This limitation renders the permitting process meaningless, and cannot be narrowly tailored to legitimate goal. The City does not contest these arguments and the Court may conclude the permitting scheme unconstitutional for these reasons alone.

Instead, the City focuses on its officials' self-restraint and insurance for parades and festivals. Resp. at 21-28. It misconstrues the law. The

Ordinance's unbridled discretion and insurance requirements also make it unconstitutional. Mot. at 15-16, 18-19.

### 3.1 Officials' self-restraint does not cure the Ordinance's unbridled discretion.

A regulation "may not grant unbridled discretion over permitting decisions." *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1250–51 (11th Cir. 2004). The grant of discretion itself, regardless of the execution, unconstitutionally allows the suppression of viewpoints. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). And properly interpreted, the Ordinance does just that.

"Local ordinances, like all statutes, are subject to traditional rules of statutory interpretation." *LaCroix*, 38 F.4th at 948. "The interpretation of a statute begins with its language." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1276 (11th Cir. 2020). If the text is unambiguous, that ends the interpretative inquiry. *Id.*

Here, the text authorizes the Public Works Department to deny a permit that it concludes will "interfere with the safe and efficient movement of traffic and the use will cause no danger to the public." Code § 804.807(7). It fails to give precise and objective guidelines to exercise this discretion. *See Vigue v. Shoar*, 494 F. Supp. 3d 1204, 1226 (M.D. Fla.

2020) (assessing identical standard for permit approval in § 337.406(1), Fla. Stat. (2019), and finding it inadequate). Similarly, the text empowers the city attorney alone to decide the "satisfactory" indemnification form. Code § 804.807(4). This too is unbridled discretion. *See Burk*, 365 F.3d at 1255-56 (assessing identical language and finding it unconstitutional). The excessive discretion makes the permitting scheme unconstitutional. Mot. at 15-16. The plain language of the Ordinance vests unbridled discretion—the legislative intent was to empower executive officers to figure this out. Thus, the permitting scheme does not contain "narrow, objective, and definite standards to guide the licensing authority." *Forsyth*, 505 U.S. at 131. It is unconstitutional.

City officers have now allegedly decided how they will exercise the City Council's grant of unbridled discretion. They have now set their own guidelines and published an indemnification form. Resp. at 22-24. Yet, the executive officers' practice of self-restraint does not cure the Ordinance's grant of unbridled discretion. A new City administration (or the current one) may reverse course.

A facial challenge "rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so." *Forsyth*, 505

U.S. at 133 n.10. The City's short-lived practice is not established and nothing in the Ordinance prohibits alterations. The City now essentially says that it will ignore the Ordinance's command to deny a permit that interferes with traffic or causes a danger to the public, and will instead grant permits to anyone who completes an application. That cannot be true, and Courts have never blessed an unconstitutional ordinance because officials pledge to ignore it in practice. Furthermore, while the City has confirmed its current practice in this litigation, nonparties simply reading the Ordinance will be deterred from applying.

### *3.2 Insurance requirement is not narrowly tailored.*

The City has not tailored the insurance requirements to the permitted First Amendment activity. The possible liability arising from a large parade or festival—which would likely require street closures and attracts large crowds—*see* Resp. at 25-26 (citing *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1272 (11th Cir. 2006)), clearly differs from Cosac's limited First Amendment activity. Yet, the City requires the same insurance for solicitors as it does for all permits and contracts. Malone Decl. (ECF 19-1) at ¶ 6. Requiring insurance that may cost $1,000, *Black Heritage Soc'y v. City of Houston*, CV H-07-0052, 2007 WL 9770639, at *15 (S.D. Tex. Dec. 4, 2007), is excessive.

## CONCLUSION

Based on the above argument and authorities, the Court should enjoin the City as requested.

| | |
|---|---|
| **Ray Taseff** | s/Benjamin James Stevenson |
| Florida Bar No. 352500 | **Benjamin James Stevenson** |
| rtaseff@floridajusticeinstitute.org | Fla. Bar. No. 598909 |
| **Dante P. Trevisani** | Stevenson Legal, PLLC |
| Florida Bar No. 72912 | 919 Panferio Drive |
| dtrevisani@floridajusticeinstitute.org | Pensacola Beach, FL 32561 |
| Florida Justice Institute, Inc. | T. 702.306.6708 |
| 40 NW 3rd Street | bjs@stevenson-legal.com |
| Suite 200 | |
| Miami, FL 33128 | |
| T. 305-358-2081 | |
| F. 305-358-0910 | |

*Counsel for Foundation*